Milton Albert, J.
This is a claim for the appropriation of claimant’s land pursuant to section 30 of the Highway Law, *327 •which proceeding is described as Cross County Parkway, Gramaton Avenue to North Columbus Avenue, Westchester County, Map No. 201-R-l, Parcels Nos. 201 and 257.
The aforesaid map and description were filed in the office of the Secretary of State on the 27th day of April, 1965 and in the office of the County Clerk of Westchester County on the 4th day of June, 1965.
The claim was filed with the Clerk of the Court of Claims and the Attorney-General on the 9th day of December, 1965 and has not been assigned or submitted to any other court or tribunal for audit or determination.
The court adopts the description of the appropriated property as shown on the map and description filed in the Westchester County Clerk’s office, a copy of which is attached to the claim and same is incorporated herein by reference.
The claimant was the owner of the property by reason of two deeds, one dated June 12, 1957 from Congregation Brothers of Israel, grantor, to Fleetwood Synagogue, grantee, recorded in the Westchester County Clerk’s office on the 21st day of June 1957, in Liber 5711 of Deeds, at page 44 and one dated March 30, 1961 from E. & N. Properties, Inc., grantor, to Fleetwood Synagogue, grantee, recorded in the Westchester County Clerk’s office on the 3rd day of April, 1961, in Liber 6095 of Deeds at page 316.
The property was located in the City of Mount Vernon and fronted on the north side of Broad Street. The parcel was rectangular in shape, having 100± feet of frontage on the street, and was 143 ± feet deep. Prior to the appropriation, it contained 14,300± square feet. The property was quite level and at grade with the exception of the rear of the parcel where it sloped downward toward the Cross County Parkway which ran in an east-west direction about 30 ± feet below the grade of the property.
The parcel was improved with a one-story concrete block synagogue with a decorative brick veneer on the front. The interior of the synagogue had an entrance lobby, the sanctuary and a kitchen on the main or upper floor. The lower level of the building contained an assembly hall, two classrooms, two offices, a kitchen, two rest rooms, two boiler rooms and a meter room. The structure, 40 feet wide by 80 feet deep, was in good condition.
In addition, the parcel was improved with a lawn area, shrubbery, a driveway and a patio. All utilities were available to the site.
The court has viewed the property.
*328 The highest and best use of claimant’s property before the appropriation was the purpose for which it was designed, a house of worship and religious school building for those who observe the Orthodox Jewish faith; and the highest and best use of claimant’s property after the appropriation was the same provided appropriate modifications and installations are made to reduce the noise from the reconstructed highway to a level acceptable for a house of worship and a school.
The subject proceeding appropriated in fee approximately 0.02± acre or 1,000± square feet of claimant’s property and comprised a strip across the entire rear of the property with a depth of 10± feet. The subject proceeding also appropriated, by means of a permanent easement, an additional strip adjacent to and abutting the fee appropriation for a retaining wall and fence. The easement strip also extended over the entire width of the parcel and was 21 ± feet in depth on the west and 29± feet deep on the east. It contained 0.053± acre of land or 2,300± square feet. No improvements were contained within the appropriated area with the exception of (1) an open frame booth or enclosure, called a Sukkah and used for religious purposes on the Sukkoth festival in the fall of each year and (2) 1,356± square feet of concrete patio. Also contained in the appropriated area were seven or eight trees which formed a screen to the rear of the synagogue.
Claimant’s expert valued the land before the appropriation at $43,000 and the building and land improvements on a cost less depreciation basis with support from one sale at $90,500 for a total before value of $133,500. The State’s expert valued the land before the appropriation at $10,000 but valued the building and land improvements on a cost less depreciation basis at $124,100 for a total before value of $134,100. There was, therefore, little difference in total value of the experts as to the before value of the synagogue building, improvements and land considered together.
The differences became apparent in their valuation of the property after the taking. Claimant’s expert placed an after value on the property of $60,500 for a damage total of $73,700, of which $3,000 was for the direct taking, $700 for the easement (on a temporary basis) and $70,000 as consequential damage to the remaining property — $50,000 to the building and $20,000 to the land. The State’s expert believed there was an after value of $118,950, with $15,150 for damages. He attributed a value of $700 for the fee appropriation, $1,450 for the permanent easement, $1,000 for the improvements taken, and *329 the balance — $12,000— as consequential damage to the building and remaining improvements.
The State’s appraiser in his appraisal and in his testimony justified his $12,000 severance damage to the buildings and improvements as loss of utility of the remainder, loss due to proximity of the right-of-way line to the building, and loss due to the permanent easement limiting expansion of the building toward the rear. In his testimony, he stated that the loss of the area in the rear as the result of the fee taking did have the effect of reducing the amount of additional building that could be put on the property by way of expansion. He specifically stated that he did not consider noise as an element in computing his after value and the resultant consequential damage to the building and remaining improvements.
The claimant’s appraiser was of the opinion that the effects of the taking, including the noise, made the building no longer suitable for meditation and worship and that the congregation would be forced to find another location. In this connection, it is noted that he testified that, based on his before valuation of $90,000, the building had suffered a $50,000 consequential damage.
At the trial there was testimony on behalf of the claimant by its Rabbi and Cantor and by a lay member that ventilation and fresh air were by means of opening windows and doors, depending upon the season of the year, and that prior to the reconstruction of the highway the noise from the then existing highway did not have an adverse effect on the services, on the teaching in the synagogue’s school, and on the ability of members of the congregation to follow and participate in the services without distraction. They further testified that under the Orthodox Jewish services there are prayers which must be chanted or recited in a low voice or silently and that when these are now chanted or recited the highway noise has a distinct distracting effect so that the congregation does not hear or that the concentration and meditation associated with the silent prayer is lost because of the noise. In response to a question the court was informed that amplification facilities for the conduct of religious services were not permitted under the Orthodox faith. There was further testimony that the congregation becomes distracted because of the highway noise, cannot follow the Cantor, and loses track of the intellectual messages in the Rabbi’s sermons. With respect to the school, there was testimony that the children are unable to concentrate because of the highway noise.
*330 After careful consideration of the testimony at the trial, the appraisals and exhibits in evidence, the demeanor of the witnesses, and the court’s view of the subject property, the court finds as follows:
1. With respect to the valuation of the land, the appraisers differed very substantially — the State’s appraiser valued it at $10,000 — 70^ per square foot — while the claimant’s appraiser valued it at $43,000, which was $3 per square foot rounded.
The court finds that this land should not be valued by comparison with land sold for private residential purposes at approximately $1 or less per square foot, but rather that it should be valued as comparable to land purchased for commercial purposes or for multi-family apartment house type of construction. This is because this land is in a built-up area where there is very little vacant land and yet where the members of the congregation of the synagogue live and where they walk to religious services on Friday evenings, Saturdays and holidays.
The court considers as most comparable claimant’s sales numbered 14 — 18, which were purchased for apartment house use at prices generally in excess of $2 per square foot. Making downward adjustments for location, for times of sale, and for assemblage influence, the court finds that the subject land had a fair market value of $2 per square foot or a total fair market value of $28,600.
Based on this valuation, the court finds that the 1,000± square feet taken had a fair market value of $2,000 and that the permanent easement should be valued at 90% of a full taking for 2,300± square feet computed on a basis of $2 per square foot. The 90% approach was advanced by the State’s appraiser and the court adopts the same. On a 90% basis of the court’s finding of $2 per square foot, this computes out to a fair market value of $4,140, which the court rounds to $4,150.
In this connection, the court notes that this finding concerning the valuation of the permanent easement is in excess of the $700 fixed by the claimant’s appraiser in his appraisal and the $1,450 fixed by the State’s appraiser. Claimant’s appraiser explained that he had valued the easement taking on a temporary one-year basis and not on a permanent basis. The court finds that the easement should be valued as a permanent one, which is its true character, and that it should be valued on a 90% basis at its square foot fair market value. It is noted in this connection that the permanent easement area, while in the rear of the synagogue, was quite valuable to the synagogue because it was an area into which the synagogue could have *331 been expanded toward the rear. Thus, the court finds that the $2 per square foot valuation, which the court has applied to the land as a whole, should be used as the basis for valuing this permanent easement take.
2. The court adopts the State’s appraiser’s valuation of $1,000 for improvements taken.
3. With respect to the valuation of the synagogue building, the appraisers approached the valuation problem on the basis of its being a specialty. This the court views as appropriate under Harvey School v. State of New York (14 Misc 2d 924) and Matter of Simmons (127 N. Y. S. 940). (See, also, 2 Orgel, Valuation Under Eminent Domain [2d ed.], § 188, last par. p. 4.)
The court, accordingly, approaches the valuation problem concerning the building on a reproduction cost less depreciation basis and adopts the claimant’s appraiser’s valuation of $90,-000 as the before fair or sound market value of the synagogue building.
4. A major problem that arose during the trial of this claim related to the question of whether noise from the reconstructed highway could be considered as an element of consequential damage in view of the fact that there was here involved an actual taking in fee, as well as a taking by way of permanent easement.
The State objected to any consideration of noise as an element of consequential damage, but did come in with an alternative approach in the event that the court determined to consider such noise as an element.
The State offered the testimony of an acoustical engineer to the effect that the noise from the highway was above the standard limitations generally accepted as applicable for houses of worship and then presented a cure approach whereby a sound-isolating door would be installed in place of an existing door in the rear of the building and whereby the windows along the sides of the building would be sealed by the addition of plate glass on the exterior. These installations, in his opinion, would reduce the noise to a level below that acceptable for a house of worship.
It was left for another engineer to provide a solution by way of cost and by way of providing for fresh air which previously was obtained by means of opening the "windows and doors. The court will consider the latter engineer’s proposed solution later in this decision.
So far as the basic question of whether noise can be considered as an element in determining consequential damage here, the court, after careful research and consideration, has *332 come to the conclusion that the answer to this question should be in the affirmative. In arriving at this conclusion, the court has considered the opinions of the majority of the Court of Appeals including Chief Judge Fuld in his concurring opinion, and of the minority in Dennison v. State of New York (22 N Y 2d 409) and finds, after particulary reviewing what Chief Judge Fuld said in his concurring opinion and what the minority said, that noise may be considered as an element of consequential damage where a house of worship is concerned. The court refers to the following paragraph in Chief Judge Fuld’s concurring opinion at page 414: “ The essential factor which distinguishes the case before us from the general run of cases — and, perhaps, relates it to those involving hospitals and cemeteries (see, e.g., Mount Hope Cemetery Assn. v. State of New York, 11 A D 2d 303, 313, affd. 10 N Y 2d 752) — is the quietude, the tranquility and the privacy of the property, qualities which the claimant prized and desired and which undoubtedly are items that would be taken into account by an owner and a prospective purchaser in fixing the property’s market value ” and to what the minority said in the following paragraph at page 416: “ The danger of unrestricted acceptance of this enlargement of public liability is suggested by the fact no requirement is imposed, as it ought to be if liability is to be broadened, that the party seeking damages show himself injured in a special way, not shared by the general public, e.g., a hospital, a school, a church.”
The court notes that noise was considered as an element in computing consequential damage in Mount Hope Cemetery Assn. v. State of New York (11 A D 2d 303, 312-313, affd. 10 N Y 2d 752). (In this respect, see Saekman, Air Eights — A Developing Prospect,— Proceedings of the Southwestern Legal Foundation, Ninth Institute of Eminent Domain, 1969, pp. 27-32, where the general question of noise is discussed but where properties, such as houses of worship, are said to be specialty properties where damage is regarded as different in kind and compensable.)
This court’s instant construction of what was done and said in Dennison and Mount Hope with respect to special, properties, such as houses of worship, is consistent with what has been done or said with respect to other similar claims against the State (Zaremba v. State of New York, 29 A D 2d 723; Wulf v. State of New York, Claim No. 42208 [1965]; St. Bernard’s Seminary & Coll. v. State of New York, Claim No. 39803 [1964] ; Rochester Benevolent, Scientific & Ind. School of Sisters of *333 Mercy of Rochester v. State of New York, Claim No. 37807 [1962]; cf. Klein v. State of New York, Claim No. 42540 [1965]).
5. The State’s other engineer testified to a cost-to-cure approach whereby a sound-isolating door would be installed in the rear of the building, the windows on the upper floor would be sealed by plate glass installed on the exterior, and a venting fan would be installed on the roof. This came to a total of $2,200.
When asked where fresh air would come from, his reply was that this would come from filtration from the lower floor and the front door. It was his impression that there were air-conditioning facilities in the lower floor, which was questioned by the claimant. This expert’s measurement of the ceiling height on the main floor also was questioned.
As the result of such questioning, he modified his cost to cure by substituting a venting fan with greater capacity at an additional cost of $165 and, when informed that the lower floor was used for classroom purposes and was, therefore, subject to the same noise objection as the upper floor, he modified his approach to say that the lower windows also could be sealed to reduce the noise in the classroom areas to acceptable levels. This would add somewhat to his modified dollar figure for his cost to cure. When asked where fresh air would then come from, his answer was that this would be by filtration from the front door, even when closed during cold weather.
The court cannot accept this cost-to-cure approach because the court finds that it does not provide for an adequate supply of fresh air for the synagogue worship area and for the classroom areas. The court has in mind that there are occasions during the year when the synagogue might have to accommodate 300-400 people and finds that the proposed method of providing fresh air for so many people is unacceptable.
The court, accordingly, rejects the State’s proposed cost to cure, although the court believes that, consistent with modern building and ventilation techniques, it would be possible to make modifications in this building and its facilities whereby the noise from the highway would be reduced to acceptable levels and whereby, at the same time, a supply of fresh air would be provided. The court notes, for example, that the State’s engineer’s approach did not even provide for the additional costs of operating the venting fan and of providing additional heat that would most certainly be required if such approach were utilized.
The court has in mind the possibility of installing the sound-isolating door and sealing all the windows on the sides as *334 proposed by the State’s acoustical engineer and then providing an adequate air provisioning system that would provide fresh air sufficient for the building. The court also has in mind that such an installation would be more costly than the State’s engineer’s cost to cure and that it would involve greater maintenance and operating expenses.
After considering the State’s appraiser’s 10% consequential damage to the building and improvements, as the result of the taking without the element of noise, and after considering the claimant’s appraiser’s more than 50% consequential damage to the building as the result of the taking, including the effects of noise, the court finds that for all of the elements of consequential damage here cited by the State’s appraiser plus noise, the building was consequentially damaged so that it had an after value of only $60,000. This results in a consequential damage of $30,000. In arriving at this finding, the court has also considered the effect on the value of the land by reason of a need to provide a building on it with features that reduce outside noise
and still provide adequate fresh air.
6. The court totals its award as follows:
a. Land taken in fee................... $ 2,000
b. Permanent easement................ 4,150
c. Land and building improvements
taken ............................ 1,000
d. Consequential damage to building____ 30,000
$37,150
The claimant is awarded the sum of $37,150 for all damages direct and consequential, with interest thereon from June 4, 1965 to December 4, 1965 and from December 9, 1965 to the date of entry of judgment herein.
In view of this decision and the court’s disposition therein of the issues involved in this claim, the motions made by the State at the close of claimant’s case and at the end of the trial are now denied.